The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Oyez! Oyez! May it please the Court, J. B. Davis, representing Kendrick Brinkley. If officers didn't have enough in Hill, where the issue of residence was conceded, they certainly don't have enough here. Hill's girlfriend had confirmed that he lived with her. And the officers had seen Hill at their house two weeks earlier. Here, they had no direct evidence connecting Brinkley to residing in or being present at the Estonia Trace Drive apartment. And that fact distinguishes this case not just from Hill, but from virtually every case where a court of appeals has upheld an entry based solely on an arrest warrant, particularly when the standard implied is probable cause. As the Sixth Circuit noted in the United States v. Harden, a common feature of these cases is recent, eyewitness evidence connecting the suspect to the residence and often even conduct by the suspect that demonstrates a tie to the residence. Nothing so firm connecting Brinkley to the Estonia Trace Drive apartment. The CJ Leeds database itself contained three other addresses for Brinkley in the six months leading up to the arrest alone, including one just days before the AOC database entry that linked to the Estonia Trace apartment. They also had a Waterville and Brinkley's name for another address, which the First Circuit at least would hold as per se sufficient to support a reasonable belief that Brinkley lived there, and possibly another address where the police had encountered Brinkley on a previous occasion. Viewed in totality, this does not add up to the type of reliable evidence that's necessary to form a reasonable belief that Brinkley resided at the Estonia Trace apartment. I think what Hill teaches us, though, is beyond just that, whether or not they had a reasonable belief that this was Brinkley's residence. The uncertainty about it still plays into the question of whether or not there was a reasonable belief that Brinkley was present at the time that they made entry. Because in Hill, this court held that the fact that there was another address for Hill and the fact that there was reason to believe that he might not be there at his townhouse was something that the court considered and played into whether the officers had a reason to believe that he was actually inside the townhouse at the time that he showed up. Here was significantly less evidence of where Brinkley lived. The officers had significantly more uncertainty about the fact whether he would be at the place that they chose to go to. And that is way in when you see what happened when they arrived at the Estonia Trace apartment and decided to enter based solely on the conduct of Brinkley's girlfriend, Ms. Chisholm. And I think the question that this court has to answer is, is what happened at the Estonia Trace apartment, is Ms. Chisholm's conduct sufficient? Not just to fill the evidentiary gap between... I just want to make sure I'm clear on the last point. What you're saying is that based on Hill and otherwise, that the strength or weakness of the evidence with respect to residence affects and plays into the ability to meet the second element. So if, for example, in a hypothetical, I'm obviously not talking about this case or Hill, there was absolute certainty with documentation as long as you could come up of where an individual lived, and it was certainly their residence, then the quantum of proof needed to establish the second element is lower. I think that's correct. And the inverse. I think that's absolutely correct, Your Honor. And I think the third circuit in Vasquez's algorithm laid that out very well when it said the same idea that a person is likely to be found where they live means they're unlikely to be found where they don't live. So the more uncertainty there is about where they live, the less likely they are to be found there. And I think that entire test, the formulation as it was applied in Hill, is really just a reflection of what the Supreme Court said in Illinois v. Gates, that when you do a totality of the circumstances, fourth circuit analysis, you don't have a strict, rigid factor-by-factor test, and deficiency in one could be made up for by a strength in the other and vice versa. And do we, based on Hill, in making that determination, we don't look at the officers in Hill as this discussion, we don't look at their subjective belief as a result of it being their subjective belief, but we do look at what a reasonable officer and an officer's subjective belief may be some evidence of what a reasonable officer would understand based on the evidence that you have. I mean, you listed off a number of databases and the like. Officers are familiar with and deal with those databases and understand what types of evidence is reliable and not reliable. To what extent do we have to look at what these officers interpreted, and just with respect to residents, how they interpreted this information, having a lot more knowledge than we do about the reliability of certain databases or certain types of information, right? Your Honor, I think that there is an extent to which you look at the objective facts through the lens of the reasonable officer, but I don't think that overtakes the objective facts that are actually before the court. So I think in Hill, I hesitate to interpret what Judge Gregory was saying, since he would do it better than I would. For better or worse, it's your job. But I think in Hill, the point of that was saying you have a situation where you have an officer who is saying, I formed this belief based on the fact that he had fled earlier and this officer had experience in how someone who has fled earlier would act, which is not necessarily available to this court sitting here except through the lens of the officer. And that's why in that particular case— Again, I'm talking hypothetical. I'm trying to figure out the framework, not necessarily the facts here. But if you had an officer that testified— again, I'm not talking about this case— but an officer that testified, yes, there were two databases here, one listed this address, one listed the other address, but I know that this second database is highly unreliable. I know how it's formed. In my experience, it's not worked. I've not been able to rely on it reasonably. But this other database is really great because it's a certain type of information that I find to be really reliable. That type of analysis, we would give sort of deference if that was taking place. I think that's correct, Your Honor, unless there was some other reason to believe that the database that he said was reliable was actually unreliable. I think if the officer is saying, I've relied on this database in the past and it has reliably gotten me results, I think that would certainly be something that this Court should consider in its analysis. Can I ask you about the standard? Yes. So we haven't resolved what standard applies, and you've been applying one all morning, but I assume that you would have come to the same result  You're right, Your Honor. I take Your Honor's question as being, would we still argue that we win even if it was a lower standard than probable cause? I thought this morning you were talking about a lower standard. I'm saying that this would not meet probable cause, but I would argue that it wouldn't meet the lower standard either. So I do think Hill controls, and I think that the distinctions in terms of Ms. Chisel's conduct are not sufficient to outweigh the uncertainty about the residence. So what is the quantum that you need for probable cause? It's not more likely than not, is it? No, it is not. It is not. It is a reasonable belief based on reasonably reliable evidence that a person of common prudence would rely on in reaching a decision here. So it is not as high as the preponderance, no. And do you, you know, we talk about probable cause in all kinds of contexts. Do you think it means different things in different contexts? No, Your Honor. It's a fluid, as the Supreme Court said, it's a fluid fact-specific determination. But the standard itself doesn't differ. Correct. I think that's right. Okay. Now, I mean, I do think there is some squishiness in this area because some circuits have said, specifically the 5th and 11th have said, well, this isn't the same standard, but it is roughly the same standard, and that gets a little confusing. But even those circuits seem to mostly treat it as though it were probable cause. And just in sort of some, what is, help me sort of understand. I mean, the Supreme Court seems to not have a model of clarity in what reason to believe means, at least in the cases that I've had a chance to review. Sometimes, I think it's probably fair to say they call it something like reasonable suspicion. Sometimes they seem to use it in conjunction with probable cause. Why should we choose among those two? And if so, just sort of briefly tell me why, given that conflict, we sort of can come out one way or the other. Certainly, Your Honor, and I would also refer you to the Vasquez algorithm case, which has a much better explanation than I'll do here. However, when you look at the Supreme Court's precedent, both in Peyton v. New York itself and more broadly, they frequently use terms like reason to believe in defining probable cause or another context of probable cause. Though Your Honor correctly points out they're not always consistent with that. Because they also use it with respect to reasonable suspicion. That's absolutely correct, Your Honor. But in Peyton specifically, Peyton's decision starts with them stating there's no dispute that there was probable cause for them to believe that Peyton was home. And then you also have Justice White's dissent in Peyton, where he refers to the court as imposing an additional standard of probable cause. So those two things together seem to indicate that the reason to believe that was referred to in Peyton is probable cause. And the Supreme Court in Maryland v. Cluity, which is a protective suite case, and what it was dicta, it said having a valid arrest warrant and probable cause to believe that the suspect was inside, the police were authorized to enter. So one can infer from that that if they believed it was a lower standard, they would have said having an arrest warrant and reason to believe that he was within. But from a more policy-based standpoint, the invasion of the home, the physical invasion of the home, as Peyton said, is the chief evil against which the language of the Fourth Amendment is directed. If you have a standard that is lower than probable cause, then you are creating a situation, if you look at the circumstances of where the officers believe, have a suspicion that they are at the arrestee's home, but are wrong. You're creating a situation where a private person's private dwelling has been invaded without anyone finding any form of probable cause for that dwelling. And that's just inconsistent with the Supreme Court's strong emphasis on the sanctity of the home and the protection of the home under the Fourth Amendment. I don't mean to monopolize here, but what's the response to the argument that this is a false choice, right? So people want to say, you know, Peyton said reason to believe. You know, that's what it said. We're not here to try to say that that's the equivalent of anything else. We just apply reason to believe. And, you know, you've got to think about what that means, but you don't have to equate it to reasonable suspicion or probable cause. In many ways, that's what some courts have done. The Eighth Circuit has more or less done that. That's what the Eleventh Circuit has basically explicitly done. But I think the strongest argument against doing that is the idea that the Supreme Court would create an entirely new Fourth Amendment standard out of whole cloth without any explanation is less likely than that they meant to use that word to mean what they have used it for in other contexts. But, of course, the counter to that is they could have said probable cause. That is true. Instead of reason to believe. That is true, Your Honor. If they had, then there would not be a circuit split, I think. I think you're absolutely correct about that. Regardless, we would argue that whatever standard the court applies, this case doesn't meet it. One thing I want to specifically bring to the court's attention as my time winds down is everything from the officer's perspective going into the apartment depends on the idea that they believe, frankly, would be in there hiding from them. But there is no evidence in the record that Brinkley would have had any awareness that the officers were out there trying to arrest him, that there was a warrant for his arrest. The offense for which he was being arrested had occurred in April the previous year and had already been dealt with entirely by the state. So there is no reason to believe he would have been... But wait. I'm not sure how important this is, but when they knock on the door and say police, I mean, in theory, if he knew there was a warrant outstanding for his arrest, which I believe the record suggests that he did, at that point he would have reason to not come to the door. I mean, hiding, I'm not sure what difference that makes, but... I don't think there actually is anything in the record that suggests that he knew that there was a warrant out for his arrest. And that's my point. I don't think there is anything in the record that says that he would have had any knowledge that they were actually trying to arrest him and would have been actively trying to... Well, when they came to the door and said police and his friend opened the door and only put it open a crack and they said why he was there, he didn't come forward and say, what's the problem? So I don't know about hiding either, but he wasn't greeting the police, was he? No, may I respond? Sure. No, he absolutely wasn't. And the fact that he may have been in the back perhaps concealing something else is not really necessarily relevant to what the officers would have believed and what knowledge was available to the officers at the time that they made entry, which is the relevant situation. Right, but I thought you, I'm sorry, I thought we got into he didn't know and so there was no reason for him. How did we get into the hiding? Yeah. I mean, you brought us into here. Gratuitously so. I mean, what was your point about that? My point, Your Honor, is that we're looking at what the officers knew and the officers entered because they believed it seems that everything they did was conditioned on this idea that Chisholm would be sheltering, frankly, from them, that he would be hiding from them. But there is nothing to the record. Only after she went and opened the door and she kept looking back. I mean, I don't know that we have any evidence at all that they thought she was hiding him until then. I just don't understand what you're saying, I guess. My entire point, Your Honor, was just to point out that there was no reason to believe that he was a fugitive. In other cases, even Judge Agee's dissent and Hill tried to point to the fact that the officers would have knowledge that this was someone who was trying to conceal themselves. What does that tell, I mean, you know, as Judge Hill, as the Chief indicated, I'm sorry, I'm trying to say the Chief, the Chief indicated in Hill, right, the fact that he knew that he was a fugitive might well be interpreted to indicate that he wouldn't be at his residence because he was trying to not get caught. I'm just not sure what we're gathering, what we're trying to take out. I mean, maybe it cuts the other way. I'm not sure that your point doesn't actually suggest that it's more likely, if this was his residence, that he would be home because he had no reason to go hide somewhere else because he didn't know he was a fugitive. So, I mean, maybe it goes, maybe Ms. Ray's going to explain to us why that makes it more likely that your client was there. I'm just not sure I understand the point of that. Well, that's fair enough, Your Honor, and my point is that they didn't have a reason to believe he was there, and if that's established on its face, then I don't think I need to pursue it any further. If the Court has no further questions. Here we go. Ms. Ray. Thank you, Your Honors. May it please the Court. I want to begin by noting, emphasizing, I suppose, that any information that the officers gleaned after they arrived at this home, but before they entered, could also be used in the did they have reason to believe that this was his residence assessment. So the demarcation of what quantum of proof you have is when they make entry. And the Tenth Circuit makes that point in Denton, as does the First Circuit in Young. In other words, until they make that entry, all that information they're collecting can go to both Do they have reason to believe that this is his home, or he's residing there? And I note that someone can have multiple residences, not just one. And second, do they have reason to believe that he's present at the time? So Ms. Chisholm's reaction can be part of the information that this Court considers in determining whether or not the officers had reason to believe that this was his residence. In addition to that, we don't just have one piece... In making that, I don't want to interrupt you, but your colleague's point, I want to see if you agree with, I get your point. But the strength, at the time of entry, the strength or weakness of the first element is certainly pertinent to the quantum of proof, whatever the standard is, put that aside. But the quantum of proof to establish that depends in part on the first element. I agree. I completely agree with that. And I don't think in this case that the evidence that this was his residence was particularly weak. Especially once we get to Ms. Chisholm's reaction, Priggen's reaction, and all the rest of it. But even before that, the officers had information that within that month he had been cited, there was an administrative office of the court's document that he had received a citation and given that address. In addition to that, there was a Department of Corrections record that provided that address. And this officer, who we can presume, I think the District Court could presume, has some familiarity with these records, testified that that likely was the address that he gave his probation officer. And you had other recent addresses too, it was different. Absolutely he did. No question about that. But these were the most recent addresses. They were the most recent. And the question is... But there were others less than six months, weren't there? Yeah, well, there were. But what the officer testified was that these, based on his experience, because some of these addresses also went back a long way. They weren't just in the most recent six months, they also went back. He testified that likely those were family addresses. And that they were going to check out those locations if it turned out that he wasn't or they didn't have reason to believe that he was presently at Ms. Chisholm's residence. So the officers explained that. And I think part of this is we're talking about a fair, even if it is a probable cause standard, and I would respectfully suggest it makes no difference. Not in this case, and I would actually suggest I don't know of a case in which it would have made a difference, really. But at the end of the day, even if it's probable cause, is it a fair probability? And I think based on what the officers testified, that they saw the record in C.J. Leeds, they followed it up with both cross-referencing the Department of Corrections, the citation report, and the Facebook account, which showed that he was in relationship and there was one photograph that suggested they were engaged and that Ms. Chisholm resided there. It wasn't just a single police report. Then they go there and we have Ms. Chisholm respond in the way that she did. They hear noises in the background. All of this can go to the question of whether or not they had reason to believe that this was his home, that this was where he was staying. I take your point about we put into the decision what happened when they tried to enter the house and when they knocked on the door. But to get there, I mean, they have to have, it seems to me, a pretty strong reason to be there under the Supreme Court law. Your Honor, with all due respect, officers can knock and talk anytime. They don't have to have a reason. They can knock and talk and that's all they were doing. So I think it's important for the court to recognize that that's not true. That's not what Peyton says. Peyton doesn't say you have to have reason to believe it's his residence before you ever approach the home. Peyton says you have to have reason to believe it's his residence before you enter the home. And that sort of was the point I took from Hill is that they didn't go to that residence, at least the officer testified, with the belief that he was there at all. Eighty percent he testified that he wasn't there. Right, but we don't count that either. Well, actually, you know, correct. It's an objective standard, but let's be clear. This court has said and so have others that an officer's assessment is at least some evidence. I know. This is what I sort of my, I credit you. Actually, I thought both briefs were really excellent. But I credit you on your absolutely, as far as I could tell, accurate presentation of the facts here. Thank you. For whatever, you know, good and bad. But what I thought the brief was a little thin on was the law. And so what maybe you can tell me the two or three cases that you think are closest to this one. And I take that. That support your position. I appreciate that. I don't know that you can rely on Hill. Oh, I think I can rely on Hill. Okay. I think I can definitely rely on Hill because I think it is readily distinguishable. Well, it's a distinguishable, but I want ones that. Right. Well, I understand. And I'll say this about it. And I take the criticism. And my apologies for not going through those. It was an observation. Understood. And I'm just saying I hear it and appreciate it. So I would refer the court to the District of Columbia's decision in Taylor as well as the 11th Circuit's decision in Magluda. Both of them. In Magluda, there was an 830 in the morning entry with a lot of conflicting evidence about whether this was his residence. And the court held that that was enough because it was 830. And even though there was some conflicting evidence, that was enough. That case is favorable. Taylor, same thing. Taylor says 9 o'clock entry is enough. And with just really very little evidence, specific evidence, that this was his residence other than. I don't remember exactly what it was in Taylor, but I remember thinking that it wasn't a lot. But most of the cases that I've read that have said. Most of the cases talk about verifying this with people. Like interviewing a neighbor or talking to somebody that lives downstairs who lives upstairs. We have none of that. Right. And the other thing they do is to or to, you know, follow him around. Or to use records that, for example, like the utility records. Right. Which I think the First Circuit says that that just sort of in and of itself establishes. But we don't have any of those things here. Right. No, I don't. We don't have the kind of personal follow-up in that kind of way. I can see that. But the question is that there are cases, I would respectfully suggest, that have less than we have. And the question is what does the Constitution require? It requires a fair probability. Indeed, it certainly does. But this whole area, we don't know the standard. And it's so fact-specific. And the cases seem to me to go every which way. And you, of course, have to deal with circuit precedent. Right. And I'll address that. And maybe you think circuit precedent is wrong. I mean, you know there's always own bank review. Absolutely. Yeah. And it's fun. But anyway, I would say this about that precedent, which is part of why I didn't go into tons of cases. Because, frankly, I looked at the standard. And I felt like, yeah, they have a fair probability. It didn't even have to be by a preponderance, especially before they entered. That is what they have to have. So, yes, a lot of the cases the officers take more time. This was a sweep. That doesn't mean that they could rely on any lower standard, to be sure. But I think that when they had information, that he had provided that address within the last month in two different records. And I just didn't see a case with quite that kind of. There was a case where they relied on a police report, but there was other evidence. And I would say this is a police report, but also other evidence. Well, your colleague on the other side talks about how these records that were relied upon are not accurate. And the very fact that he tried, one of the police officers said he tried to confirm it with another database. And I think your colleague draws the inference that the other database didn't confirm it. I'm not sure that's in the record, but the police officer doesn't say the other database did confirm it. So maybe that inference is in the record. Well, the KB COPS was mentioned, and they don't actually say what KB COPS showed or not showed. So, yes, I think it's probably a fair inference that it must not have been at least clear that this was his residence or this was where he was staying. But the officers both testified, including Agent Murphy with ATF, that he was very satisfied and, in fact, thought when he arrived about 90 percent sure based on the C.J. Leeds, the DOC, the AOC, the Facebook. I mean, it wasn't as if they looked at C.J. Leeds. And I will not concede that C.J. Leeds is not reliable, but I do think that it needs some corroboration. And they got that corroboration. Well, they got the Facebook. They also got these other two reports that he had reported that address in January of 2017, before the February knock and talk. So they did have, they did corroborate it. What they didn't do was conduct surveillance. It would have been lovely if they had. They didn't. They didn't need to. The Fourth Amendment doesn't require that. I would like to address Hill. And just on this point, and I want you to address Hill too, but on this point, I take it your argument from that is that is one way that Hill is distinguishable. Because Hill had no self-report of residence and relied on the single fact that there had been a domestic violence 911 call where the report had indicated that the defendant lived there, but not part of any charge, not part of any self-report, not part of any database. I mean, none of the things that you've got here, sort of each of those is stronger than what was existence in Hill. Now, they conceded in Hill, the defendant conceded in Hill, but there was, in addition to the one report, there was conflicting evidence of other addresses there. And so is that one of the significant distinctions with Hill? Yes. How could it be? It's stronger. It was conceded. It was conceded in Hill, which means it didn't make any difference. Now, how can it be strong? At best, you could say you have strong things that are in equipoise, and I assume you would argue that. But you have to admit that you have some, as you said, some perhaps checker uncooperated, but you say it adds to strong. But it can't be, from a legal standpoint, be stronger than when you conceded. Fair enough. I don't really mean from a legal standpoint, but if that concession didn't exist, and then we were looking at it and said, what did they have? What they knew was that he had fled from that address. And, of course, again, we look at before they went in, what did they have? They had the girlfriend or companion in that case. Before you get to that, I take the Chief's point well. With respect to looking at the first element, the concession is very strong. But as you and your colleague have both talked about, the strength of the evidence with respect to prong one affects our analysis on prong two. And I was not clear in my question, but the question that I was asking is, in evaluating prong two, and Hill does this itself, in walking through and talking about the conflicting evidence on prong one, even though it was conceded as bearing on prong two, the strength of your evidence by comparison means the quantum in prong two is lower. I guess so, yes. I mean, I have to kind of think about that. I'm sorry. It's lower in which one? I'm not sure. In which case? It's lower. Again, the stronger the evidence for residents, the lower the quantum is for is the person there. I mean, this is the point, I think, sort of the premise that we talked about with your colleague. Yes, and so without the legal concession, in Hill, we had less information that he was there before they made entry, because all we had was he had left the home two weeks earlier in a domestic violence incident, and then we had the companion saying he's not there, the only thing it could be would be my sister, and the officers testified that they heard an unidentified noise that could have been the television. And they had a recent traffic citation that was at a different residence. Right, and here we have a recent citation that has him at this residence. So I think that by the time they go in, yes, if you just remove the legal element from Hill, they had less information before they went in than we have in this case. But it doesn't matter. The point is you can't get away from the factual concession means you get 100 percent credit for believing that it's his residence. The evidence in Hill is conceded. And so it's like going back, well, this is stronger because here it would have been stronger. It's almost like saying in this case, let's assume that you had reason to believe that was his residence. The question that you were saying that because she was frightened and she opened the door, because there was noise, what is noise? I mean, every day I guess you open a person's house and you open their door, what's noise is a person living there. Is that noise? I mean, it becomes noise. Judge Gregory, I mean, with all due respect, it wasn't just that she was nervous. It was an immediate reaction to the question of Brinkley whether he was there. Not only that, but they testified that her nervousness increased. Why would he? Because. Is this your boyfriend? How many police officers are here though? There were five. Five police officers armed, open. Your boyfriend here? Right. No, he's not. Do you think they're giving her a look? Did they believe her? I don't know what kind of look. That's not in the record, Your Honor. They told her ultimately they didn't believe her. They did. At the end, right before they went in, they told her they didn't believe her. I'm not suggesting that she shouldn't have been nervous. No, no, no. What I'm saying is that you got five armed police officers knocking on your door saying, your boyfriend here? No, he's not. And you think that you can add nervousness to that to justify this? Absolutely. Not only can you add it. But, Your Honor, Ms. Pragen, they testified that when there was a particularly loud noise in the bedroom, her head snapped back. They both continually looked back. And Agent Murphy testified that it was almost like a subconscious. Every time there was noise, she would kind of look back, look back. Her nervousness increased. She couldn't finish sentences. She was stammering. You know what the danger of this argument is, in terms of the Fourth Amendment, is what you said earlier. You said, we don't even need any reason to knock on somebody's door. We can just knock on the door for any reason. So they wouldn't have to have any evidence of resonance, knock on the door, and then five people standing there. If you get a nervous reaction, something, noise, then that gives you entry. Your Honor, we're not saying that. That is the essence of your argument. With all due respect, Judge Gregory, it is not. We did not come there in a vacuum. We came there with the information. No, but I'm saying, in terms of the logical extension of your argument, is you said you could be there for no reason. We are permitted to knock and talk. Wait a minute. You said you could be there for no reason at all. Didn't you say that? I did. But that is not the logical extension of our argument, because we would not say that that is consistent with the Fourth Amendment. We would not say that. We would not simply say that if she was nervous, that was enough. And that's not what we have here. What we have here is we have two court records, one a citation, one he's given that address. We have multiple corroborated indices that this is where he is living at the time. We have that when we approach. So we have reason to believe right there that he lives there. It's 830 in the morning. As you did in Hill, which was conceded. So you're saying Hill is surmounted just because you get a nervous turn, snap their head around in noise, that distinguishes Hill. I'm saying that in Hill there was affirmative information that he was not present. Not only did the girlfriend say he wasn't said, it's only this, and all they had was an unidentified noise. And what you had here was, well, I think what you said in Hill was, there's no reason for him to be there. The only person that had reason to be there is somebody else. But here, strongly, you have a person at the door saying he is not here. Right. So the negative of his presence is stronger here than in Hill. Right. And the Supreme Court has recognized over and over and over again that officers, this probable cause assessment, assuming it's probable cause, has to take into account an experienced officer's assessment of the situation. A reasonable officer, I believe. That's right. And they testified that based on her conduct and based on what they were seeing in terms of her immediate reaction, not just nerves when she opened the door, nerves when they started asking about him that got more and more increased. They asked about him from the very beginning. Yes. So it didn't change. Well, they first said, presumably, hello, and they said that, you know, here we are. She took a long time to get to the door, which is fine. It's 830 in the morning. That is a factor the court can consider. It's early enough. But they should be happy that she opened the door, because in the United States we have a right not to even open our door. Absolutely. So she ought to get credit for it instead, right? She can get all the credit. Well, she was a little late, but that's okay. Your Honor, the question is, taking all of those pieces of information, is it enough to say, less than a preponderance, is it fair for the officers to have concluded that he was there, that he lived there and that he was there? And I see that my time is up. If Your Honors don't have further questions. I have a question, Ms. Wright. Yes. And my question is that question that Justice Breyer always asks people. And so how would you suggest that this be written? Would you actually suggest that we take back Hill? No. I think it's reconcilable with Hill entirely. I really do. I don't think this court needs to do anything with Hill, because I think that this case has a lot more evidence that he was present than we had in Hill. And so I think it's consistent. Now, how I think this court should write this opinion is to recognize that this is a fact-specific inquiry, that we have officers who are experienced, testified that this is the information they had, that they know how to read these databases, this is what they concluded, and that when they went there based on their experience, their confidence that he was there grew significantly. From 90% to 99.9%. Right. But in other words, it was confirmed by all of the factors that they saw, which included not just noise, but the reaction and the very nervous reaction, this almost sounded like scared reaction, snapping back your head when you hear noise in the back. There is that, and that's enough for officers to just, again, fair probability that he's there. Okay. Thank you. Thank you, Your Honor. I don't. Yes, Mr. Davis. Thank you, Your Honor. I think there are two things that are significant about what happens at the door that are omitted from the government's telling. Can I ask you, before you embark on that, Ms. Ray made the argument that we are entitled to count that into the equation of whether this was proper or not. Do you agree? Into whether or not this was, in fact, his residence? I do think that's right. I think if you have a limited reason to believe he lives there, and you open the door and there he was, that would certainly be some evidence. That would sort of nail it for you, yeah. But in this particular case, I think you have two issues. One is Ms. Chisholm's looks back when Brinkley is mentioned are less significant because every time Brinkley is mentioned, the officers are also either explicitly or implicitly saying that they want to come inside. There's never a mention of Brinkley that doesn't include the suggestion that they are trying to get into her house and invade her home. And the first thing that Detective Stark says is, I asked if Brinkley was there and can we come in? And it proceeded like that from there on. You never have a situation where they just say, where is he, have you seen him? And what I want to note with that is the lack of particularity in regards to this noise in the back. There is nothing about it that particularizes it to Brinkley, whether this is his residence or not. There is nothing that particularizes it to Brinkley as opposed to the children who they had reason to believe might live there or to some unknown person because they already knew with Ms. Pridgen that there were people in this house that they did not know about. Well, they knew it wasn't her or the companion that opened the door. It was out of the room. So those two people were eliminated as sources of the noise, right? That's right. Those two people were, but I think the And the noise was not a voice. No, it was not. So it was not even animated noise. That's right. That's correct, Your Honor. But I think the presence of Ms. Pridgen shows that there were people there that the officers didn't expect. They knew there might be more people here that they weren't prepared about. So Ms. Pridgen's boyfriend, for example, could have been who was in the back or Ms. Chisholm's children or Ms. Pridgen's children. There is nothing about Ms. Chisholm's behavior that would particularize that set of circumstances to Kendrick Brinkley as opposed to anyone or really anything else in the back room. And I think that's the issue here. In order to reach the standard, whatever it may be, there has to be some particularity that would cause the officers to say, this is who this is. And the 830 in the morning time frame is not sufficient. Basically every court, I think, Taylor is the actual only decision that has mentioned 830 without giving some other reason to believe that this specific person would have been home at 830. And Taylor doesn't actually really discuss that. It's more or less picked up. Don't we give some deference to the district court's findings on this? I mean, if the district court had gone the other way, you obviously would have an easier case. But the district court did make some findings about what was reasonable in light of the testimony heard. And I can read the testimony. But, you know, as you know, it's hard to read testimony and get the same thing out of it as being there. And so it seems like the district court here gets some deference in having heard all of this lie. Certainly the district court's findings facts would be reviewed for clear error. I don't know if there's specific facts. Okay, that's what I was going to say. What finding of fact was there? I'm thinking more of the inferences that the district court draws. And Ornalas tells us that, you know, we give due deference. It's not the sort of same clear error sort of thing, but they tell us we give due deference to the inferences that the fact finder draws. It seems to me here that the inferences drawn were that it was reasonable to believe that Chisholm was making the noise. You know, that's the district court's finding. That's a legal question, isn't it? Yes, it is. That's a legal question as to the amount to whatever the standard is. There's no finding of fact here. It's conceded there was noise. Nobody's saying that she didn't turn around. That's exactly right, Your Honor. I think the closest thing to a questionable finding of fact is the finding that 830 in the morning is too early. And I think to the extent that's a finding of fact, that would be clear error. I think this argument started at 830 and everyone in this courthouse was here and left their home. My time is expired. Any questions? Thank you, counsel. Thank you, Your Honor. I'm sorry. So there was something that Ms. Ray had said that I wanted to sort of get your views on, but probably I'm forgetting it right now because I got into this due deference. So for a minute, review for me, you don't think that's a factual finding? I believe that to the extent that the court found that 830 is... Not the 830. Oh, I'm sorry. The noise was likely that it was... You think that's all a factual finding? That the noise was most... I mean, all a legal finding. That the noise was most likely, frankly? Yeah. Yeah, I do because I think the court set out exactly the facts that it based that on and that was its conclusion based on those facts. And I now remember what I wanted to ask you. So we have these two prongs that you have to establish. And remember the dialogue that my colleague had with opposing counsel and the suggestion was, well, if you're stronger on one, then you can be weaker on the other. And you agree with all of that? I agree. I don't agree with her analysis. Her end line. Yes, I do agree with that. And we have in Hill the concession or whatever with respect to the first. So the first prong is established, right? Yes. Because of that. But if we are looking at the underlying evidence, don't we make the same calculation? I mean, we don't just say, just don't look at that at all. We have to look at what the evidence was before there was a concession, don't we? I believe that's true. And I think what I would take issue here is the idea that there's any direct evidence that frankly actually provided these addresses. Because that is not in the record that they actually came from. No, I understand. I understand your position. Okay. I was about to say, there's not an evidence in the record that he provided any of those. No, there is not, Your Honor. Okay, we'll come down to Greek Council and move to our next case.
judges: Roger L. Gregory, Diana Gribbon Motz, Julius N. Richardson